UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TONY TABOR | CIVIL ACTION |
| versus | NO. 11-1116 |
| TERRY TERRELL, WARDEN | SECTION: "J" (1) |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Tony Tabor, is a state prisoner incarcerated at the Allen Correctional Center, Kinder, Louisiana.  On August 19, 2005, he was convicted of second degree kidnapping

under Louisiana law.[1]  He was subsequently found to be a second offender and was sentenced as such to a term of twenty years imprisonment without benefit of probation or suspension of sentence and fined $1,000.[2]   On June 8, 2007, the Louisiana First Circuit Court of Appeal affirmed petitioner's conviction and habitual-offender adjudication; however, his sentence was vacated and the matter was remanded for resentencing.[3]   On July 11, 2007, he was resentenced to a term of twenty years imprisonment without benefit of probation or suspension of sentence and without benefit of parole for the first two years.[4]

On March 13, 2008, petitioner filed with the state district court an application for post-conviction relief.[5]  His post-conviction claims were denied on May 15, 2008,[6] and January 21, 2009.[7]  On June 7, 2010, the Louisiana First Circuit Court of Appeal thereafter denied his related

---

[1]  State Rec., Vol. III of IV, trial transcript, p. 325; State Rec., Vol. III of IV, minute entry dated August 19, 2005; State Rec., Vol. II of IV, jury verdict form.

[2]  Supplemental State Rec., Vol. I of II, transcript of November 16, 2005; Supplemental State Rec., Vol. I of II, minute entry dated November 16, 2005; Supplemental State Rec., Vol. I of II, transcript of December 7, 2005; State Rec., Vol. III of IV, minute entry dated December 7, 2005; Supplemental State Rec., Vol. I of II, Sentence and Reasons for Sentence dated December 7, 2005.

[3]  State v. Tabor, 965 So.2d 427 (La. App. 1st Cir. 2007) (2007 KA 0058); State Rec., Vol. I of IV.

[4]  State Rec., Vol. IV of IV, transcript of July 11, 2007; State Rec., Vol. III of IV, minute entry dated July 11, 2007.

[5]  State Rec., Vol. III of IV.

[6]  State Rec., Vol. IV of IV, Order dated May 15, 2008.

[7]  State Rec., Vol. IV of IV, transcript of January 21, 2009; State Rec., Vol. IV of IV, minute entry dated January 21, 2009.

writ application because he failed to submit the required supporting documentation.[8] Petitioner then resubmitted that application with the supporting documentation; however, the Court of Appeal again denied relief on November 22, 2010.[9]   The Louisiana Supreme Court likewise denied post-conviction relief on February 18, 2011,[10] and also denied reconsideration on April 8, 2011.[11]

On or about April 27, 2011, petitioner filed the instant federal application for *habeas corpus* relief.[12]   The state contends that the application is untimely.[13]

Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."  Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).[14]

---

[8]  State v. Tabor, No. 2010 KW 0646 (La. App. 1st Cir. June 7, 2010); State Rec., Vol. IV of IV.

[9]  State v. Tabor, No. 2010 KW 1349 (La. App. 1st Cir. Nov. 22, 2010); State Rec., Vol. I of IV.

[10]  State *ex rel.* Tabor v. State, 57 So.3d 323 (La. 2011) (No. 2010-KH-0283); State Rec., Vol. IV of IV.

[11]  State *ex rel.* Tabor v. State, 61 So.3d 674 (La. 2011) (No. 2010-KH-0283); State Rec., Vol. IV of IV.

[12]  Rec. Doc. 1.

[13]  Rec. Doc. 11.

[14] Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

As noted, petitioner's conviction and habitual offender adjudication were affirmed on June 8, 2007; however, his sentence was vacated and he was resentenced on July 11, 2007. "[W]hen a state prisoner's conviction is affirmed on direct appeal but the sentence is vacated and the case is remanded for resentencing, the judgment of conviction does not become final within the meaning of 28 U.S.C. § 2244(d)(1)(A) until both the conviction and the sentence have become final by the conclusion of direct review or the expiration of the time for seeking such review." Scott v. Hubert, 635 F.3d 659, 666 (5th Cir. 2011). Therefore, under § 2244(d)(1)(A), petitioner's criminal judgment became "final" on August 10, 2007, when his period expired for seeking direct review after resentencing. See La.C.Cr.P. art. 914 (providing for a thirty-day period in which to seek appeal). Accordingly, his period for seeking federal *habeas corpus* relief commenced on that date and expired one year later, unless that deadline was extended through tolling.

The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court. 28 U.S.C. § 2244(d)(2). After two hundred fifteen (215) days elapsed, petitioner tolled his federal limitations period by filing a post-conviction application with the state district court on March 13, 2008.[15] Tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long as petitioner sought

---

[15] The United States Fifth Circuit Court of Appeals has held that federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record with respect to this filing, the Court will use the signature date as the filing date, in that the application was obviously placed in the mail no earlier than the date it was signed.

supervisory review in a timely manner.  <u>Grillette v. Warden, Winn Correctional Center</u>, 372 F.3d 765, 769-71 (5th Cir. 2004).

The state argues that tolling ceased in the instant case upon petitioner's failure to file a timely writ application with the Louisiana First Circuit Court of Appeal.  This Court is unpersuaded by that argument for the following reasons.

The state district court granted petitioner what it termed an "out-of-time appeal" from the denial of post-conviction relief and set a return date of April 30, 2009.[16]  Citing extenuating circumstances, petitioner later filed a motion for extension of time.[17]  The Louisiana First Circuit Court of Appeal expressly granted that motion and reset the return date to April 12, 2010.[18]  Petitioner clearly met that extended deadline by filing a writ application which was signed on April 5, 2010, and file-stamped by the Court of Appeal on April 7, 2010.[19]  The Court of Appeal did *not* reject that application as untimely; rather, it simply denied the application because petitioner failed

---

[16]  State Rec., Vol. IV of IV, Order dated February 20, 2009.  It is noted that the state court's order is curious in two respects. First, a petitioner cannot "appeal" a denial of post-conviction relief; rather, he is limited to seeking supervisory review.  La.C.Cr.P. art. 930.6(A) ("The petitioner may invoke supervisory jurisdiction of the court of appeal if the trial court dismisses the application or otherwise denies relief on an application for post conviction relief.  No appeal lies from a judgment dismissing an application or otherwise denying relief.").  Second, petitioner's application was submitted within thirty days of the denial of relief, so it was not "out-of-time."  <u>See</u> Louisiana Uniform Rules of the Courts of Appeal Rule 4-3; <u>see also</u> <u>Melancon v. Kaylo</u>, 259 F.3d 401, 404 (5th Cir. 2001).  However, the court was perhaps referencing the fact that it set an extended return date beyond the period normally allowed.

[17]  State Rec., Vol. I of IV.

[18]  State Rec., Vol. I of IV, Order dated February 9, 2010.

[19]  State Rec., Vol. I of IV, writ application in case number 2010 KW 0646.

to submit the required supporting documentation.  Moreover, the Court of Appeal expressly gave

petitioner permission to refile a corrected writ application by August 6, 2010.[20]  Petitioner likewise

met that deadline by filing a new application which was file-stamped by the Court of Appeal on July

22, 2010.[21]  Although the Court of Appeal also denied that application, it again did so without any

indication that the application was untimely.[22]  In light of these facts, this Court declines to find any

defect regarding timeliness.

---

[20]  State v. Tabor, No. 2010 KW 0646 (La. App. 1st Cir. June 7, 2010); State Rec., Vol. IV of IV.

[21]  State Rec., Vol. I of IV, writ application in case number 2010 KW 0646.

[22]  State v. Tabor, No. 2010 KW 1349 (La. App. 1st Cir. Nov. 22, 2010); State Rec., Vol. I of IV. Of note, the United States Fifth Circuit Court of Appeals has held:

> [W]hen the denial of an application is based on untimeliness, Louisiana courts routinely and unmistakably indicate so in their opinions.  See, e.g., Carter v. Rhea, 785 So.2d 1022, 1022 (La.Ct.App. 4th Cir. 2001) ("WRIT APPLICATION DISMISSED AS UNTIMELY."); Lawyer v. Succession of Kountz Through Cupit, 703 So.2d 233, 233 (La.Ct.App. 4th Cir. 1997) ("WRIT NOT CONSIDERED."); Watts v. Dorignac, 681 So.2d 955, 955 (La.Ct.App. 1st Cir. 1996) ("WRIT NOT CONSIDERED").  Thus, had the Louisiana Court of Appeal decided to reach the merits of the application notwithstanding a determination that the application was untimely, it appears that the court would have indicated any such untimeliness in its opinion.

Grillette, 372 F.3d at 775.

Based on the foregoing, the undersigned, out of an abundance of caution, finds that tolling based on petitioner's state post-conviction proceedings continued uninterrupted until the Louisiana Supreme Court ultimately denied his motion for reconsideration on April 8, 2011.[23]

When the limitations period resumed running at that point, petitioner had one hundred fifty (150) days of his federal limitations period remaining.  His federal application was filed no more than nineteen (19) days later, and, therefore, it was timely.[24]

Because the state raises no other procedural defects with respect to petitioner's federal application, the Court will address his claims on the merits.

<u>Standards of Review</u>

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).

---

[23]   Although a motion for rehearing is expressly forbidden by Louisiana Supreme Court Rule IX, § 6, it appears that federal *habeas* courts must nevertheless give a petitioner tolling credit for such filings.  <u>See</u> <u>Wilson v. Cain</u>, 564 F.3d 702, 704-06 (5th Cir. 2009).

[24]   A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  <u>Roberts v. Cockrell</u>, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  It is unclear when the instant application was given to prison officials for mailing; however, it was mailed in an envelope bearing a postage meter stamp of April 27, 2011.  Rec. Doc. 1, p. 14. Therefore, it was obviously delivered to prison officials for mailing on or before that date.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and

footnotes omitted), cert. denied, 131 S.Ct. 294 (2010).

      Regarding the "unreasonable application" clause, the United States Supreme Court

has explained:

> [A] state-court decision can involve an "unreasonable application" of
> this Court's clearly established precedent in two ways.  First, a
> state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing
> legal rule from this Court's cases but unreasonably applies it to the
> facts of the particular state prisoner's case.  Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this

inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in Williams that an unreasonable application is different from an

incorrect one."   Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application

of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

      While the AEDPA standards of review are strict and narrow, they are purposely so.

As the United States Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's
> contrary conclusion was unreasonable.
>     If this standard is difficult to meet, that is because it was
> meant to be.  As amended by AEDPA, § 2254(d) stops short of
> imposing a complete bar on federal court relitigation of claims
> already rejected in state proceedings.  It preserves authority to issue

the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added).

<u>Facts</u>

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts

of this case as follows:

The victim, Brandi Lynn Beyer Van Norman, testified at trial. Approximately three weeks before the incident, she met the defendant while she was making a pizza delivery to a bar. Thereafter, the victim and her three children began visiting the defendant at his grandmother's house, where he also lived. The victim and her children stayed overnight at the defendant's grandmother's house "a couple of times" during the three-week period.

Specifically, on Friday, May 21, 2004, the victim and her children spent the night with the defendant. The next day, the defendant, the victim, her children, and the defendant's friend, Danny Robichaux, drove to the beach at Grand Isle. The defendant drove the victim's car to and from the beach. (R. 103). After spending the day at the beach, and after taking Robichaux to his home, the defendant, the victim, and her children returned to the defendant's grandmother's home. The victim and her children again spent the night with the defendant.

According to the victim, on Sunday, May 23, 2004, the defendant left her and her children at the defendant's grandmother's home and drove away in the victim's car, stating he was going to church. At approximately 12:00 noon, the defendant returned. The defendant subsequently drove the victim, her children, and himself to

church in the victim's car.  Shortly after arriving at the church, the defendant spoke to a man.  The defendant then told the victim to "get the kids and let's go."  The defendant then drove the victim, her children, and himself to the defendant's mother's house in the victim's car.  The defendant told the victim someone was looking for him in connection with a "probation thing."

Thereafter, the defendant drove the victim, her children, and himself to the defendant's grandmother's house in the victim's car. According to the victim, after they arrived, she asked the defendant for her car keys because she had to take her children home to get them ready for school the next day.  The defendant became upset with the victim because he wanted her to spend the night.  The victim pleaded with the defendant to give her back her car keys.  Defendant told the victim that he did not have her car keys, but she did not believe him.  The defendant asked the victim to go into the house and talk to him.  She complied with his request, but left her children outside.  The defendant begged the victim to stay overnight, but the victim refused.  She told the defendant that she needed to tend to her children because they had school in the morning.  The defendant then told her, "Well, I'm going to shoot you with my nine."  The victim went back outside, telling the defendant she did not want her children to be outside by themselves.  The defendant followed her outside. The victim continued to ask the defendant for her car keys, and he continued to refuse to return the keys.  The victim stated, "Fine," and told the defendant he could have her car, but she was going home. The victim tried to run away from the defendant.  The defendant, however, ran up behind the victim, grabbed her hair, and made her fall to the ground.

The victim eventually returned to the defendant's grandmother's house with the defendant.  The defendant told the victim, "Don't try to run again."  He then acted as if he was calling the police.  The defendant spoke into the telephone, and seemed to be inviting "the police" to come to his house because of a drug dealer in the house who had drugs in her car.  After hearing that, the victim stated, "He's lying.  He don't let us go home.  Please help us."

The victim further testified, as follows:  "[W]e kept trying to run.  Every time we run (sic) he kept catching us."  The victim asked the defendant to let her get her clothes and put them in her car.  The defendant went into his grandmother's house, and the victim "snuck" into the house and took her clothes from the utility room.  When the defendant found out the victim had taken her clothes out of the house, he spun the victim around, grabbed her throat, and stated, "Are you

f'ing stupid?"  The victim told the defendant she was going back outside and went outside.  The defendant responded, "What do you think you are doing?[,]" and slammed the victim's head against a brick wall.  During this altercation, the victim's oldest daughter, B.V., said, "Mama, come on, let's go home."  The defendant then picked up B.V. by her head and threw her into the victim's car.

Thereafter, the defendant went into his grandmother's house, and the victim and B.V. ran to the next street.  The defendant drove up to the victim and B.V. and told the victim to "[g]et in."  The victim's two youngest children were in the car with the defendant. The victim refused, stating, "No.  You can keep the car.  I want my kids and I'm getting out.  I'm going home.  I'm walking home."  The defendant again told the victim to get into the car, and she again refused.  The defendant offered to let the victim drive.  The victim and B.V. got into the car and drove in the direction of the defendant's grandmother's house, but stopped before reaching the house.  The defendant demanded that the victim drive to the house, but she refused.  The defendant and the victim struggled over the keys in the ignition, and the defendant pulled the victim's head down by her hair and put his hand in her mouth.  The victim bit the defendant's hand. The defendant punched the victim in the face and bit her left wrist. The defendant then jumped out of the car and ran to his grandmother's house.  The victim drove away with her children.  She denied ever threatening or attempting suicide.  She denied jumping out of a car on the night of the incident.  She also denied that the defendant told her that someone from Baton Rouge was coming to pick him up and she had to leave.

The victim identified State Exhibit # 1 as a photograph depicting a bruise and a bite caused by the defendant punching her in the face and biting her.  The victim identified State Exhibit # 2 as a photograph depicting a bruise on her eye caused by the defendant punching her in the face.  The victim identified State Exhibits # 3 and # 5(B)-# 5(D) as photographs depicting the bite on her arm caused by the defendant.   The victim identified State Exhibit # 4 as a photograph depicting swelling of her throat caused by the defendant grabbing her throat.  The victim identified State Exhibits # 5(A) and # 5(E)-# 5(H) as photographs depicting the "black eye" the defendant gave her.  The victim identified State Exhibit # 5(I) as a photograph depicting swelling to her neck caused by the defendant.

B.V. also testified at trial.  She was nine years old at the time of her testimony.  She gave the following account of the events surrounding the incident.  The victim went to pick up the defendant

– 12 –

from "somewhere" after school.  The defendant asked the victim and her children to sleep over and they agreed.  The next day, the victim washed some clothes.  "Whenever it started to get dark," the victim wanted to leave because her children had school the next day, but the defendant did not want to give the victim her keys.  When the victim went to get her clothes out of the laundry, the defendant grabbed her by the leg and pulled her away from the dryer.  The defendant asked the victim to go to his room so that they could talk.  While the victim and the defendant were in the defendant's room, B.V. took "the keys" from the top of the deep freezer and hid them under the seat of the car.  According to B.V., the victim saw that the keys were no longer on top of the deep freezer, so the victim knew B.V. had the keys when the victim finished talking to the defendant.  The victim got into her car and attempted to leave, but the defendant grabbed her by the hair and threw her against a brick wall.  B.V. told the defendant to stop hitting the victim, and the defendant picked B.V. up by her head, threw her into the car, and closed the car door on her foot.  The victim told her children to "get out of the car so [they] could run."  The victim and her children got out of the car and ran, but the defendant drove up to them.  The defendant told the victim and her children to get into the car, but the victim refused.  However, the victim and her children got into the car after the defendant said he would let the victim drive.  The defendant told the victim to drive to "his" house, but the victim drove only to a stop sign.  The defendant demanded that the victim go under "his" carport, but the victim refused.  The defendant "got upset" and tried to take the car keys from the victim, but she kept holding them.  The defendant put his fist in the victim's mouth and bit her arm.  Also during the struggle for the keys, the key chain broke, and the keys fell onto the floor.  The defendant then got out of the car and ran into "his" house.  The victim picked up the car key from the floor, started the car, and drove away.

      The victim's son, C.V., also testified at trial.  He was eight years old at the time of his testimony.  He indicated that he, his two sisters, and the victim slept over at the defendant's grandmother's house one day, and the defendant wanted them to sleep over again.  The victim, however, wanted to go back to her house because C.V. and his sisters had to go to school.  The defendant "got mad" and started beating up the victim.  The victim ran away from the defendant, but the defendant pushed her down and pulled her by the hair.  The defendant went back to his grandmother's house, but then returned and told the victim that she could drive.  The victim wanted

to drop the defendant off at the stop sign, and the defendant "got mad." The defendant pushed his hand in the victim's mouth and bit her. He also "broke the key." Defendant then got out of the car, and ran to his house. C.V. indicated that the victim did not bite the defendant when he put his hand in her mouth. C.V. also denied that the victim had any pills on the night of the incident.

Dr. Jay Clement Alexius, Jr. testified that he worked at Terrebonne General Hospital Emergency Room and treated the victim on May 24, 2004. The victim was suffering from a facial contusion, a human bite, and muscular back pain, which may have been chronic. The victim complained that an acquaintance had grabbed her by the throat, had hit her over her left eye, and had bitten her on her left wrist.

Travis Sanford testified that on May 23, 2004, he worked for the Terrebonne Parish Sheriff's Office. On that date, the defendant advised Officer Sanford that the defendant and the victim had broken up, the victim had threatened suicide, and the defendant was concerned that the victim might commit suicide. The defendant told Officer Sanford the victim might claim the defendant had beaten her up, but that would be a lie.

Officer Sanford located the victim in the emergency room of Terrebonne General Hospital. The victim indicated she had had an altercation with the defendant after she decided she wanted to leave "the house," and the defendant did not want her to leave. The victim indicated that the defendant had her car keys and would not give them to her. She also stated that the defendant had tackled her, thrown her to the ground, hit her, and, when she tried to run away, he "drug her back to the residence." Officer Sanford noticed that the victim had a bite mark on her left wrist, had a clump of hair missing from her head, had bruising and swelling on her left eye, and had a big knot on her forehead. The victim told Officer Sanford that the defendant had inflicted her injuries.

The defendant also testified at trial. He claimed he had a relationship with the victim, which lasted approximately eighteen days, in the spring of 2004. He claimed the victim would come to the house he shared with his grandmother at approximately 2:00 a.m. or 3:00 a.m., stay at the home until approximately 5:00 a.m. or 6:00 a.m., "put her kids on the bus," and then come back to the house and "do whatever [the defendant] had for [the victim] to do." He claimed he did not have a sexual relationship with the victim, and he paid the victim for work she did at "his" house. The defendant claimed that

during his relationship with the victim, the victim was aware that he had a girlfriend, Michelle Thomas, who lived in Baton Rouge.

The defendant claimed he spent May 22, 2004 at the beach with the victim, her children, and Danny Robichaux until the victim left at about 4:00 p.m. to go to work. He claimed that the victim called him on his cellular telephone at approximately 7:00 p.m., and wanted to come to see him. He claimed he refused, telling the victim that he was not at home, was not going to be at home, and, if he decided not to remain at his present location, he would go to Baton Rouge.

According to the defendant, when he woke up at approximately 8:30 a.m. on Sunday, May 23, 2004, the victim and her children were at "his" house. The defendant claimed the victim had allowed him to drive her car to church. For that reason, he took the victim's car to church that morning while the victim and her children slept. After the defendant returned from church, he stayed at the house. The victim washed clothes and got her children ready for school. At approximately 3:30 p.m., the defendant drove the victim and her children to the defendant's mother's house in Schriever. According to the defendant, before he arrived at his mother's house, the victim attempted to jump out of the car. The defendant pulled the victim back into the car. He indicated that he thought "it was a joke[,]" and that he believed that the victim also thought "it was a joke."

After visiting the defendant's mother, the defendant, the victim, and her children went to church. According to the defendant, one of his friends pulled a prank on him at church. The friend told the defendant that he had missed a court date and a warrant had been issued for defendant's arrest. The defendant had the victim and her children get into the car, and drove them back to his mother's house. The defendant claimed that he stopped at his mother's house, and then he and the victim and her children went to the Shop Rite in Schriever. The defendant claimed the victim became upset with him at the store after he gave an old girlfriend some money for gas. He claimed the victim also became angry after they went back to his grandmother's house and he spoke to Thomas on the telephone and told her to "hurry up and send somebody to come get [the defendant]." The defendant claimed the victim was "devastated." He testified that he told the victim to take her children and get away from "his" house. He also claimed that one of the victim's children subsequently told defendant to go outside because the victim had defendant's medicine.

According to the defendant, when he went outside, he found the victim standing in the middle of his front yard.  She was saying that she was not good enough for him.  He claimed that the victim was very angry, was crying hysterically, and was holding what appeared to be one of his pill bottles in her hand.  He claimed that the bottle was not open at that time.  He told the victim not to do something stupid, and that she was going to wake up his grandmother and his neighbors.  According to the defendant, moments later, the victim had placed several of his Soma pills in her mouth and spilled the rest of the pills on the ground.  The defendant claimed that he placed his index and middle fingers inside the victim's mouth and "raked out" three pills.  He asserted that when he did that, the victim bit him "like a dog."  He claimed that he and the victim then "kind of had a little wrestling match, cursing match."  Next, he went inside and called the police.  He testified that the victim went to her car, and got in while "screaming and hollering, claiming she was going to go commit suicide."  He denied trying to keep the victim and her children at his home or doing anything that could be construed as kidnapping the victim.  He denied biting the victim on her wrist or intentionally hurting her.  He also denied giving the victim a black eye.  He claimed he told the police that the victim might say he beat her up because she had "lied on" her ex-husband on several occasions.

Lanita Templet, the defendant's mother, also testified at trial.  She stated that the defendant, the victim, and her children came to the grandmother's house on May 23, 2004, and they seemed upset.  Templet claimed that the victim and "the little girl" told Templet that the victim had tried to jump out of the car at the railroad tracks.  Templet testified that after the victim calmed down, the defendant, the victim, and her children left to go to church.  Templet indicated that the defendant subsequently told her that the victim had bitten him when he put his finger in her mouth to remove the pills she had taken.

Mardis Sanders, the defendant's grandmother, also testified.  She claimed at approximately 10:30 p.m. or 11:00 p.m. on May 23, 2004, her dog awakened her at her home.  She looked outside and saw the victim's three children sitting on a swing, and the defendant and the victim sitting on another swing.  The victim was crying.  Sanders claimed she went back to bed.

According to Sanders, she subsequently overheard the defendant telling the victim that he wanted to go to Baton Rouge, and the victim begging the defendant not to go to Baton Rouge.  Sanders

claimed the defendant was trying to get the victim to leave and that "Michelle" was coming to the house to pick up the defendant. Sanders claimed, at approximately 12:00 midnight, she saw the victim put a bathing suit and a set of car keys on the table. Sanders testified that she subsequently heard one of the victim's children tell the defendant, "Mommy is taking some pills." Sanders claimed that the defendant rushed outside, returned with a bleeding finger, and told Sanders that the victim was trying to take some pills. Sanders also claimed that the defendant wore partial dentures for four bottom teeth, and he could not find his dentures when he was arrested. However, Sanders testified that she found the defendant's dentures in the pocket of his pajamas, two days after his arrest.[25]

### Sufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support his conviction.[26] On direct appeal, the Louisiana First Circuit Court of Appeal rejected that claim, holding:

> [T]he defendant argues that his claim, that he attempted to prevent the victim from committing suicide, was corroborated by the testimony of Lanita Templet and Mardis Sanders. He also argues that there was insufficient evidence that he kidnapped the victim by taking her car keys and physically abusing her.
>
> In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988).
>
> Second degree kidnapping is the imprisoning of any person wherein the victim is physically injured. LSA-R.S. 14:44.1(A)(3) & (B)(3). For a conviction, LSA-R.S. 14:44.1(B)(3) requires neither movement of the victim, nor that the imprisonment exists for any

---

[25] Tabor, 965 So.2d at 429-34; State Rec., Vol. I of IV.

[26] This claim was in fact the second claim asserted in petitioner's federal application. However, because its resolution is relevant to the resolution of his remaining ineffective assistance of counsel claim, this claim will be discussed first herein.

minimum period of time.  State v. White, 593 So.2d 882, 887 (La.App. 2 Cir. 1992).

  After a thorough review of the record, we are convinced that viewing the evidence in the light most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt that the defendant was guilty of the second degree kidnapping of the victim.  The verdict rendered against the defendant indicates that the jury accepted the testimony of the state's witnesses, including the victim's account of the incident, and rejected the testimony of the defense witnesses, including the defendant's account of the incident.

  This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt.  The testimony of the victim alone is sufficient to prove the elements of the offense.  The trier of fact may accept or reject, in whole or in part, the testimony of any witness.  Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.  State v. Lofton, 96-1429, p. 5 (La.App. 1 Cir. 3/27/97), 691 So.2d 1365, 1368, writ denied, 97-1124 (La. 10/17/97), 701 So.2d 1331.

  This assignment of error is without merit.[27]

Petitioner did not seek review of that judgment by the Louisiana Supreme Court on direct review.[28]

  Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting the claim unless petitioner shows that the decision "was contrary to, or involved an unreasonable application of, clearly established

---

[27]  Tabor, 965 So.2d at 434; State Rec., Vol. I of IV.

[28]  When petitioner reasserted the claim in the state post-conviction proceedings, the state district court denied it pursuant to La.C.Cr.P. art. 930.4(A) ("Unless required in the interest of justice, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered.").  State Rec., Vol. IV of IV, Order dated May 15, 2008.  Without assigning additional reasons, the Louisiana First Circuit Court of Appeal then likewise denied relief.  State v. Tabor, No. 2010 KW 1349 (La. App. 1st Cir. Nov. 22, 2010); State Rec., Vol. I of IV.  The Louisiana Supreme Court followed suit.  State ex rel. Tabor v. State, 57 So.3d 323 (La. 2011) (No. 2010-KH-0283); State Rec., Vol. IV of IV.

Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, the Court finds that petitioner has made no such showing in the instant case.

As noted by the state court, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).  Moreover, Louisiana's circumstantial evidence standard requiring that the every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.  Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 Fed. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civ. Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. 2010).

In this case, the jurors obviously found the state's witnesses credible and petitioner and his witnesses incredible.  Although petitioner disagrees with the jurors' conclusions in that regard, questions concerning credibility are generally beyond the scope of <u>Jackson</u> and *habeas* review.  See <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995) ("[U]nder <u>Jackson</u>, the assessment of the credibility of witnesses is generally beyond the scope of review."); <u>Ramirez v. Dretke</u>, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); <u>McCowin v. Scott</u>, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) ("[A] challenge of the jury's credibility choice fails to satisfy the <u>Jackson</u> standard for habeas relief.").

Accordingly, for the reasons noted by the state court, the evidence in this case, viewed in the light most favorable to the prosecution, was clearly sufficient for any rational trier of fact to find petitioner guilty beyond a reasonable doubt.  Therefore, he cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  As a result, the AEDPA requires this Court to defer to the state court's decision rejecting that claim.

Ineffective Assistance of Counsel

Petitioner also claims that he received ineffective assistance of counsel.  The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984).  Petitioner bears the burden of proof on such a claim and "must demonstrate, by a

preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as

- 21 -

to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."   <u>Crockett</u>, 796 F.2d at 793.

Petitioner's ineffective assistance of counsel claim was rejected by the state courts in the post-conviction proceedings.  Because such a claim is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable.  This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court.   Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  <u>Ibid</u>.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been

squarely established by this Court."  <u>Knowles v. Mirzayance</u>, 556
U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009)
(internal quotation marks omitted).

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 785-86 (2011) (citation omitted).  The Supreme Court then

explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task.  An
> ineffective-assistance claim can function as a way to escape rules of
> waiver and forfeiture and raise issues not presented at trial, and so the
> <u>Strickland</u> standard must be applied with scrupulous care, lest
> intrusive post-trial inquiry threaten the integrity of the very adversary
> process the right to counsel is meant to serve.  Even under *de novo*
> review, the standard for judging counsel's representation is a most
> deferential one.  Unlike a later reviewing court, the attorney observed
> the relevant proceedings, knew of materials outside the record, and
> interacted with the client, with opposing counsel, and with the judge.
> It is all too tempting to second-guess counsel's assistance after
> conviction or adverse sentence.   The question is whether an
> attorney's representation amounted to incompetence under prevailing
> professional norms,  not whether it deviated from best practices or
> most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was
> unreasonable under § 2254(d) is all the more difficult.  *The standards*
> *created by <u>Strickland</u> and § 2254(d) are both highly deferential, and*
> *when the two apply in tandem, review is doubly so.*  The <u>Strickland</u>
> standard is a general one, so the range of reasonable applications is
> substantial.  Federal habeas courts must guard against the danger of
> equating unreasonableness under <u>Strickland</u> with unreasonableness
> under § 2254(d).  *When § 2254(d) applies, the question is not*
> *whether counsel's actions were reasonable.  The question is whether*
> *there is any reasonable argument that counsel satisfied <u>Strickland</u>'s*
> *deferential standard.*

<u>Id</u>. at 788 (citations omitted; emphasis added).  For the following reasons, the Court finds that, under

these stringently deferential standards, it simply cannot be said that relief is warranted in the instant

case with respect to petitioner's ineffective assistance of counsel claim.

In this proceeding, petitioner claims that his trial counsel, William Yates, was ineffective for failing to subpoena the telephone records from the night of the incident.  At the post-conviction evidentiary hearing, petitioner explained on direct examination his argument with respect to this claim:

> Q.    Would you please state for the Court why you think that was ineffective assistance?
>
> A.    There was evidence that could have been used at trial that was not used at trial.  There was testimony that could have been used –
>
> Q.    Wait, wait, wait, wait.  You're saying evidence.  What evidence you talking – you got to be more specific, Tony?
>
> A.    Telephone recordings to the sheriff's office.
>
> Q.    Okay.
>
> ....
>
> Q.    Now before we go any further, what – specifically, what was the telephone recording?
>
> A.    On this particular night that I was accused of this alleged kidnaping, I phoned the sheriff's office because I wanted the girl to get some help.  So I called the sheriff's office seeking help for her and her three children, because besides myself my grandmother was living in the household at the time.
>
> Q.    Okay.  Well, why do you think that it was ineffective for Mr. Yates not to subpoena those records?
>
> A.    I feel as though if the telephone recordings were used at trial the verdict would have been different.[29]

---

[29]  State Rec., Vol. IV of IV, transcript of January 21, 2009, pp. 8-9.

On cross-examination, petitioner conceded that he had in fact testified concerning
the telephone call during his trial:

> Q.      Mr. Tabor, you stated that you testified at trial?
>
> A.      Yes, ma'am.
>
> Q.      And were you asked about the telephone calls that you made
> the night of the incident?
>
> A.      If I remember correctly, yes, I was.
>
> Q.      And so you told the jury that you had called the sheriff's
> office?
>
> A.      Yes, it was ...
>
> Q.      And did you tell the jury what you told the sheriff's office?
>
> A.      Yes, I did.[30]

Yates also testified at the post-conviction evidentiary hearing and explained why felt
that it was unnecessary to subpoena the telephone records:

> Q.      And did you consider subpoenaing those records?
>
> A.      No, I didn't, Mr. Doyle.  I didn't see anything in the file
> concerning his direct request that I subpoena those.  I didn't
> think it was necessary.  Upon reading the file it appears that
> Mr. Travis – at that time Deputy Travis Sanford reported that
> he had the telephone conversation with Mr. Tabor.  The
> deputy testified at trial and testified that he had received the
> telephone call.
>
> Q.      Okay.

---

[30]  State Rec., Vol. IV of IV, transcript of January 21, 2009, pp. 11-12.

A.   Mr. Tabor's grandmother testified, and I think she testified she heard him make a telephone call.  The victim, whose name I don't recall at this time, testified.  She testified that he had made a telephone call but she doesn't know who to.  And then he testified and he said he had made a telephone call.  There's no doubt that the telephone call was made; I mean there was no need to subpoena the records.  I didn't see any need to subpoena the records if everybody agreed that the telephone call was in fact made.[31]

Yates also stated that it was unclear whether the call had even been recorded:  "[A]nd my impression was it wasn't a 911 call, which would have been recorded.  It was a telephone call to the sheriff's office, which probably was not recorded."[32]

At the conclusion of the evidentiary hearing, the judge denied petitioner's claim, holding:

The Court after considering the testimony at this hearing, the entire record in this matter, and the law, makes the following observations.  Apparently, the defendant is complaining that a certain piece of evidence, i.e. telephone records of the Terrebonne Parish Sheriff's Office, was not offered into evidence by his lawyer at the trial, Mr. William Yates.  And he claims because of that he was wrongfully found guilty, and he complains that had that evidence been brought to the jury's attention by his lawyer, there would have been a different outcome.

Well, for many, many reasons I disagree.  First of all, the evidence was overwhelming at the trial.  We had the victim, Brandi Van Norman, testify.  The 9-year old daughter, Brianna Van Norman.  Charles Van Norman testified.  The emergency room doctor, Dr. Alexis, testified.  The mother of the victim testified.  Terrebonne Parish sheriff's deputy Travis Sanford testified.

Now with reference to the telephone call, I would think the defendant now wants that evidence in to prove that he in fact made

---

[31]   State Rec., Vol. IV of IV, transcript of January 21, 2009, pp. 22-23.

[32]   State Rec., Vol. IV of IV, transcript of January 21, 2009, p. 23.

the call.  If that's the reason, that's the only reason I can understand or envision why he would want it in to prove that he in fact made the call, well, there's no dispute, and there was no dispute at the trial that the phone call was made.  We have the victims talking about it.  We have the testimony of Travis Sanford form [sic] the sheriff's office testified about it.  The defendant testified.  That wasn't rebutted.  That was not made an issue.  Noone doubted that.  So I don't see how that prejudiced the defendant at all.

With that said, we even have the grandmother testified at trial, she's testified at the hearing as well.  You know, when some minor part of a case, or some minor evidence is introduced, good lawyers on the other side will pick that up and throw it right back in your face.  Good lawyers know how to cross examine is what I'm trying to say.  And as I asked the witness today, with reference to well, did you follow up with the police got there?  The answer was no, there was nothing.  My point of that is that it works both ways.  When evidence is brought up, good attorneys on the other side, and I think in this case it was Mr. Luke was prosecuting, I'll guarantee you he would have used it to combat it, but that's of no moment to be honest with you, because the Court finds as a matter of fact that the failure to introduce this piece of evidence, if it existed – we don't even know that it exists – would have made absolutely no difference in this case whatsoever.  And obviously First Circuit Court has found, and the transcript indicates, the evidence was overwhelming to convict.[33]

As previously noted, relief was thereafter also denied by both the Louisiana First Circuit Court of Appeal[34] and the Louisiana Supreme Court.[35]

As noted below, petitioner simply cannot show that the state court decision on this claim was contrary to, or an unreasonable application of, clearly established federal law.

---

[33]  State Rec., Vol. IV of IV, transcript of January 21, 2009, pp. 27-29.

[34]  State v. Tabor, No. 2010 KW 1349 (La. App. 1st Cir. Nov. 22, 2010); State Rec., Vol. I of IV.

[35]  State ex rel. Tabor v. State, 57 So.3d 323 (La. 2011) (No. 2010-KH-0283); State Rec., Vol. IV of IV.

As a preliminary matter, the Court notes that petitioner has failed to prove the factual foundation of his claim.  That is, he has not established that the call in question was in fact recorded.  If there was no recording, then his claim obviously fails.  Counsel cannot be found ineffective for failing to subpoena nonexistent evidence.  Smith v. Cockrell, No. 3-02-CV-1985-P, 2003 WL 21649942, at *3 (N.D. Tex. Jan. 29, 2003) (counsel not ineffective for failing to obtain copies of police video tapes and radio logs of petitioner's arrest where there was no evidence in the record that these pieces of evidence ever actually existed); see also Scruggs v. Warden, Lake Erie Correctional Institution, No. 1:07cv659, 2008 WL 5450607, at *3 (S.D. Ohio Dec. 31, 2008) ("A trial attorney cannot be ineffective for failure to discover evidence which does not exist.").

Moreover, in any event, even if petitioner was able to prove that the call was recorded and that the recording was still in existence at the trial of trial, he would not be entitled to relief.  As noted by the state court, the fact of the call and its contents were not disputed at trial.  Petitioner testified regarding the call as follows:

Q.     When you called the police what did you tell them?

A.     I called.  I called the operator, I could not get a hold to someone here at the sheriff's office, at dispatch, because I was on the cellphone, the initial conversation.  The second conversation, they called me back.  I called them on my house phone at the same time.  I was juggling two phones.  Called them back and I said "Look, this is really important, y'all need to do what y'all got to do," and then they said they was going to have – they took a brief description and then said somebody would call me back.

Q.     Did they in fact call you back?

A.     I was in the shower when they called back.

– 28 –

Q.      Did you talk to anybody on the phone from the sheriff's office after you got out of the shower?

A.      Travis.

Q.      So you did in fact talk to them?

A.      I did.

Q.      Did you at a later time have another conversation with Deputy Travis on the phone?

A.      I did.  He called me approximately seven to ten minutes later.

Q.      All right.  You talked to him at that time?

A.      Yes.  He wanted a more detailed description of the car.  He wanted her last name, which I didn't know and I didn't really care to have, and I gave him all I knew.[36]

In his testimony at trial, Deputy Travis Sanford, a prosecution witness, confirmed that

such a call occurred:

Q.      Now what did he advise you of at that time when you spoke with him?

A.      That him and his girlfriend had broke up, and he was concerned that she was going to commit suicide, because she was emotionally upset over it.

Q.      She was going to commit suicide?

A.      Yes, she had threatened it.

Q.      Anything else he advised you of?

A.      At the time that's all, that he was just concerned for her safety, and that she had left his house and was heading to her

------

[36]  State Rec., Vol. III of IV, trial transcript, pp. 260-61.

> residence on Pitre Street, and it was possible that she would
> claim that he had beat her up.[37]

In light of the foregoing, it is abundantly clear that the jurors were aware of the call and its contents and yet still unanimously found it to be unconvincing evidence of petitioner's professed innocence.  Therefore, there is simply no reasonable probability that the result of the proceeding would have been any different if counsel had obtained and introduced recordings of the calls, especially in light of the overwhelming evidence of petitioner's guilt.  As result, petitioner cannot show that he was prejudiced by counsel's performance in this respect, and the ineffective assistance of counsel claim necessarily fails.

For all of these reasons, the Court finds that petitioner has failed to demonstrate that the state court's decision denying his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Therefore, applying the AEDPA's deferential standard, this Court should likewise reject the claim.

## <u>RECOMMENDATION</u>

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Tony Tabor be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

---

[37]  State Rec., Vol. III of IV, trial transcript, p. 170.

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[38]

New Orleans, Louisiana, this third day of October, 2011.

SALLY SHUSHAN
UNITED STATES MAGISTRATE JUDGE

---

[38] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.